*This opinion is subject to revision before final
publication in the Pacific Reporter.*

**2016 UT 40**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

ELIZABETH CRAIG, BRADY HARPER, NU LITE SALES, LLC,
a Utah limited liability company,
*Appellees,*

*v.*

PROVO CITY, a municipal corporation,
*Appellant.*

No. 20150531
Filed August 26, 2016

On Certiorari to the Utah Court of Appeals

Fourth District, Provo Dep't
The Honorable Steven L. Hansen
No. 130400857

Attorneys:

Barnard N. Madsen, Mark D. Stubbs, Matthew R. Howell,
Diana L. Hardy, Provo, for appellees

Robert D. West, J. Brian Jones, Gary D. Millward, Provo,
for appellant

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court,
in which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, and
JUSTICE PEARCE joined.

JUSTICE DURHAM filed a dissenting opinion.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1     This is a tort suit under the Governmental Immunity Act, Utah Code title 63G chapter 7. The plaintiffs' suit against defendant Provo City was timely when initially filed, but the first complaint was dismissed because the plaintiffs failed to submit an "undertaking" or bond as required by statute. *See* UTAH CODE § 63G-7-601(2). And by the time the case was refiled (this time with a bond), it was beyond the one-year filing requirement of the Governmental Immunity Act. *Id.* § 63G-7-402. Plaintiffs sought to sustain the timeliness of the suit by invoking the so-called Savings Statute, a provision outside the Governmental Immunity Act that generally extends the statute of limitations for plaintiffs when a complaint is dismissed other than "upon the merits." *Id.* § 78B-2-111.

¶2     The question presented concerns the interaction between the time-bar provision of the Governmental Immunity Act and the general Savings Statute. We consider, specifically, whether the Immunity Act forecloses the Savings Statute. We hold that it does. We interpret the Immunity Act as speaking comprehensively to the timing of a suit against a governmental entity, in a manner precluding operation of the Savings Statute.

I

¶3     The claims at issue in this case arise out of an alleged false arrest by Provo City police officers in January 2010. Provo police arrested Elizabeth Craig, Brady Harper, and Scott Lazerson for theft. The alleged theft was of personal care products of Provo's Nu Skin Enterprises, Inc. Craig, Harper, and Lazerson were suspected of acquiring products set aside for Nu Skin employees and selling them outside the Nu Skin distribution network for profit.

¶4     The three charged defendants claimed to have acquired the Nu Skin products in question lawfully. They insisted that Nu Skin employees had donated excess product to them for the benefit of a charity. Eventually, the criminal charges against Craig and Harper were dismissed, and this civil suit ensued.

¶5     In the civil suit, Craig and Harper, together with Nu Lite Sales, an entity they formed to facilitate their venture, claimed

that Provo City had caused them to lose income and damaged their reputations. Craig, a former Miss Utah, alleged that media reports surrounding the arrest had harmed her business associations with Brigham Young University and Deseret Book, Inc. Craig, Harper, and Nu Lite asserted claims for malicious prosecution, conversion, and tortious interference with prospective business relations.

¶6  As required by the Governmental Immunity Act, Utah Code section 63G-7-402, the plaintiffs submitted a "Notice of Claim" to Provo City before filing a formal action in court. The Notice of Claim was served on Provo City on February 16, 2011. The Notice of Claim was deemed denied on April 17, 2011. There was also a Supplemental Notice of Claim, which was served on March 1, 2011, and deemed denied on April 30, 2011. Plaintiffs filed a complaint in the Fourth District Court thereafter—on April 13, 2012. The complaint was timely when filed on that date, as it was filed within one year of the denial of their notice of claim as required by Utah Code section 63G-7-403(2). But it was also defective under the Governmental Immunity Act, as it was filed without the $300 bond required by Utah Code section 63G-7-601(2). The district court dismissed the action without prejudice on that basis, in an order entered on March 27, 2013. By that date, the statute of limitations had run on the plaintiffs' claims: The district court's order of dismissal was entered more than a year after the date when Provo City denied the plaintiffs' Notice of Claim.

¶7  The plaintiffs nonetheless filed a second complaint, this time with the bond required by statute. Because this suit was filed outside the original one-year limitations period under the Governmental Immunity Act, Provo City moved to dismiss.

¶8  In response, the plaintiffs pointed to the Savings Statute in Utah Code section 78B-2-111. That provision states that "[i]f any action is timely filed and . . . the plaintiff fails in the action or upon a cause of action otherwise than upon the merits, and the time limited . . . by law . . . for commencing the action has expired, the plaintiff . . . may commence a new action within one year after the reversal or failure." *Id.* § 78B-2-11(1). Plaintiffs asserted that this provision excused their failure to file within a year of the

denial of their notice of claim by Provo City, as required by the Governmental Immunity Act. They insisted that their claim was timely because the second complaint was filed within one year after the first suit was dismissed "otherwise than upon the merits."

¶9    The district court granted Provo City's motion to dismiss. It concluded that "[c]laims against governmental parties are comprehensively governed by" the Governmental Immunity Act. *Order of Oct. 28, 2013* at 2–3. And because that Act "does not contain a savings provision," the district court held that the plaintiffs' claims were time-barred. *Id.* at 5. It accordingly entered an order dismissing the plaintiffs' claims.

¶10  Plaintiffs appealed, and the court of appeals reversed. The court of appeals concluded that the Savings Statute was applicable and thus reversed the dismissal of the plaintiffs' claims. *Craig v. Provo City*, 2015 UT App 145, ¶ 14, 352 P.3d 139. In so doing, the court of appeals acknowledged a provision in the Governmental Immunity Act describing that statute as the "single, comprehensive chapter govern[ing] all claims against governmental entities." *Id.* ¶ 9 n.3 (quoting UTAH CODE § 63G-7-101(2)(b) (2013)). But it nonetheless concluded that the Savings Statute could apply to save claims that would otherwise be time-barred under the Governmental Immunity Act. It based that holding on the notion that a "comprehensive" legal regime was not necessarily an "all-inclusive" one. *Id.* ¶ 10. And it highlighted legal matters not governed expressly by the Governmental Immunity Act, such as the elements of a cause of action against a governmental entity and the standards governing the admissibility of evidence in a proceeding initiated under the Act. *Id.* ¶ 11.

¶11  With these examples in mind, the court of appeals reasoned that the Governmental Immunity Act cannot literally be an all-inclusive statement of all laws governing claims against the government. Instead, it characterized the Act as merely "complementary" to other laws like the Savings Statute. *Id.* ¶ 14.

¶12 In so concluding, the court of appeals asserted that the Savings Statute did not interfere with the "purpose" of the

Governmental Immunity Act—to provide the government with notice sufficient to afford "the responsible public authorities an opportunity to pursue a proper and timely investigation of the merits of [the] claim." *Id*. ¶ 12 (alteration in original) (quoting *Shafer v. State*, 2003 UT 44, ¶ 7, 79 P.3d 936). And it held the legislature to a requirement of a plain statement. *Id*. ¶ 13. Relying on *Standard Federal Savings & Loan Association v. Kirkbride*, 821 P.2d 1136, 1138 (Utah 1991), the court of appeals indicated that "[t]he relevant inquiry is whether the legislature made plain an intention" to foreclose the applicability of the Savings Statute to claims against the government. *Craig*, 2015 UT App 145, ¶ 13 (alteration in original). And because the legislature "certainly knows how to" make plain such an intention, yet failed to do so, the court of appeals declined to infer any such intent here. *Id.* (citation omitted). It accordingly held that "[t]he Savings Statute applies to claims filed against the government pursuant to" the Governmental Immunity Act "because, to the extent that they relate to one another, they are complementary." *Id.* ¶ 14. Thus, because the plaintiffs' claims were timely under the Savings Statute, the court of appeals reversed the decision granting Provo City's motion to dismiss.

¶13 Provo City filed a petition for certiorari, which we granted. Our review is *de novo. See State v. Dean*, 2004 UT 63, ¶ 7, 95 P.3d 276 (noting that "we review the court of appeals' decision for correctness," but that "[t]he correctness of the court of appeals' decision turns on whether the court correctly reviewed the trial court's decision under the appropriate standard of review"); *State v. Ririe*, 2015 UT 37, ¶ 5, 345 P.3d 1261 ("We review the district court's decision on a motion to dismiss de novo, yielding no deference to its analysis.").

II

¶14 Our law has long embraced a general principle of governmental immunity. The concept has deep roots in the common law. But the common law doctrine was overtaken by statute in Utah many decades ago. *See* Utah Governmental Immunity Act, 1965 Utah Laws 390–97. Today the law of sovereign immunity is set forth in the Governmental Immunity Act, Utah Code section 63G chapter 7.

¶15 This "comprehensive" statute "governs all claims against governmental entities or against their employees or agents arising out of the performance of the employee's duties, within the scope of employment, or under color of authority." UTAH CODE § 63G-7-101(2)(b). The general presumption is in favor of immunity: "A governmental entity and an employee of a governmental entity retain immunity from suit unless that immunity has been expressly waived in this chapter." *Id*. § 63G-7-101(3); *see also id.* § 63G-7-201 (stating that governmental entities "are immune from suit" "[e]xcept as otherwise provided in this chapter"). Yet the Act also sets forth the scope and terms of waiver of immunity. It expressly identifies the actions or claims for which immunity is waived, *see id*. § 63G-7-301, and prescribes the proper timing and means by which a claim must be asserted, *see id.* §§ 63G-7-402 & -403.

¶16 These latter provisions are the ones at issue here. They provide that any claim against a governmental entity or employee is "barred" unless a notice of claim is filed with the governmental entity in the manner prescribed by statute "within one year after the claim arises." *Id*. § 63G-7-402. And they also provide a statute of limitations for "institut[ing] an action in the district court" against the government. *Id*. § 63G-7-403(2). Specifically, a claim against the government is time-barred if it is not filed "within one year after denial of the claim [by the governmental entity] or within one year after the denial period specified in this chapter has expired." *Id*. Finally, the statute also requires the plaintiff to "file an undertaking" or bond "[a]t the time the action is filed." *Id.* § 63G-7-601(2). The undertaking must be "not less than $300" and is "conditioned upon payment by the plaintiff of taxable costs incurred by the governmental entity in the action if the plaintiff fails to prosecute the action or fails to recover judgment." *Id*.

¶17 In this case, we are asked to decide whether these provisions are exclusive. The specific question presented is whether the time-bar provisions of the Governmental Immunity Act foreclose the applicability of the so-called Savings Statute, Utah Code section 78B-2-111. The Savings Statute generally allows a plaintiff to "commence a new action within one year" of the dismissal of a previous action that was timely when filed but

dismissed "otherwise than upon the merits." *Id.* § 78B-2-11(1). The applicability of this savings provision is determinative in this case: Plaintiffs' first complaint was timely when filed but dismissed for failure to comply with the statutory requirement of an undertaking, and the second complaint was untimely under the Governmental Immunity Act (because it was filed more than one year after the denial of the notice of claim). So it was proper only if "saved" by the Savings Statute.

¶18  We interpret the Governmental Immunity Act to foreclose the applicability of the Savings Statute, and accordingly reverse the decision of the court of appeals. First, we set forth our understanding of the text and structure of the Governmental Immunity Act, explaining the basis for our conclusion that the Act speaks comprehensively on the procedure and requisite timing of a claim filed against the government, in a manner foreclosing the applicability of the Savings Statute. Second, we respond to two specific points in the court of appeals' analysis—the notion that the Savings Statute can be applied without undermining the "purpose" of the Governmental Immunity Act, and the purported requirement of a "plain statement" of the legislature's intent to foreclose the Savings Statute.

A

¶19 The question presented is a matter of statutory interpretation. This one falls at the intersection of two different statutes—the Governmental Immunity Act and the Savings Statute. We are asked here to decide whether the former forecloses the latter. To answer that question, we must begin by examining the statutory text. *See Graves v. N.E. Servs., Inc.*, 2015 UT 28, ¶ 67, 345 P.3d 619.

¶20  In the court of appeals and again in this court, the parties' briefs have focused on some specific text that appears in an introductory provision of the Governmental Immunity Act—in a clause that says that "[t]his single, comprehensive chapter governs all claims against governmental entities." UTAH CODE § 63G-7-101

(2013).[1] Much of the argument has focused on the scope of the term "comprehensive." Provo City views that term as conveying the idea of an exclusive, all-encompassing "chapter govern[ing] all claims against governmental entities." *Id*. Plaintiffs offer a different construction. They insist that a *comprehensive* law need not be all-encompassing.

¶21 The court of appeals agreed with the plaintiffs. It insisted that "the ordinary meaning of the word 'comprehensive' allows for something less than complete coverage." *Craig v. Provo City*, 2015 UT App 145, ¶ 10, 352 P.3d 139. And it also rejected the *all-encompassing* notion of *comprehensive* on the ground that this view would lead to an absurdity—the conclusion that an all-encompassing Governmental Immunity Act would foreclose the Utah Rules of Evidence and substantive law on the elements of a plaintiff's claims against the government, since such laws are not expressly endorsed in the statute. *Id*. ¶ 11.

¶22 Yet the parties' all-or-nothing positions overlook the possibility of a middle position—a statute that is all-encompassing on the matters that it regulates, but that may be supplemented by other provisions of law in areas that it does not address. And we view the statute as embracing this middle view. Thus, we agree with the plaintiffs and the court of appeals that the Governmental Immunity Act is not literally *all-encompassing*; it cannot be understood to prescribe each and every law of relevance to any claim against the government. But that does not mean that the Act is not all-encompassing *on the matters that it regulates in comprehensive detail*—as to the actions for which the government has waived its immunity, and the manner and means by which a plaintiff may pierce through such immunity. And on those matters, we construe the Governmental Immunity Act as speaking *comprehensively* in the sense of foreclosing the

---

[1] This provision was amended in 2015. But even as amended, the statute seems to retain the core principle—the statement that "this comprehensive chapter . . . governs all claims against governmental entities." UTAH CODE § 63G-7-101 (2015).

application of other laws regulating claims against non-governmental parties.

¶23 The Act speaks in careful detail on the manner of filing a notice of claim with a governmental entity, *see* UTAH CODE § 63G-7-402; on the means of initiating an action in court after such a claim is denied, *see id.* §§ 63G-7-403 & -601; and on the timing requirements for both such filings, *see id.* §§ 63G-7-402 & -403. On these points we view the Governmental Immunity Act as "comprehensive" in the sense advanced by Provo City. Thus, we conclude that the filing requirements and time limitations set forth by statute are preclusive of other laws that apply more generally.

¶24 This conclusion is consistent with our recent holding in *Peak Alarm Co. v. Werner*, 2013 UT 8, 297 P.3d 592. In *Peak Alarm* the plaintiffs asserted false arrest and defamation claims against a government entity. Such claims were timely under the Governmental Immunity Act, but untimely under the statutes of limitations that apply generally to false arrest and defamation claims. And we held that the limitation provisions of the Governmental Immunity Act controlled. Describing that limitations "scheme" as "comprehensive[ ]," we concluded that it "replaces the limitations period for claims against private actors contained within Title 78B." *Id.* ¶ 26.

¶25 As the court of appeals noted in this case, *Peak Alarm* "did not consider whether a plaintiff may commence a new action where the initial action, filed within the . . . limitations period" set forth in the Governmental Immunity Act, "is dismissed for reasons other than on the merits after the limitations period has lapsed." *Craig*, 2015 UT App 145, ¶ 8. And in that sense it is true that "the issue in this case falls outside the scope of *Peak Alarm*'s holding." *Id.* But our approach in *Peak Alarm* is in line with the path we follow today. We noted there that the Governmental Immunity Act speaks "comprehensive[ly]" on the matter of the filing and timing requirements for a claim asserted against the government. *Peak Alarm*, 2013 UT 8, ¶ 26 (alteration in original). And on that basis we concluded that "the scheme provided" in the Act "replaces the limitations period for claims against private actors contained within Title 78B." *Id.*

¶26 We reach the same conclusion here as to the savings provision in Title 78B. The Governmental Immunity Act's filing and timing standards are presented in such detail that we view them as occupying the field[2]—as stating the all-encompassing[3]

---

[2] This is the terminology of federal preemption. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (noting that field preemption occurs when a statutory scheme is "so pervasive" that there is "left no room . . . to supplement it" (citation omitted)). And the analogy is an apt one. As with federal preemption, the question presented here concerns the inference to be drawn regarding the extent to which the Governmental Immunity Act is so detailed that it can be understood to impliedly foreclose other laws of more general applicability. And as in the preemption cases, we may look to the degree of intricacy and detail in the statutory scheme to discern whether the legislature meant to foreclose such general laws. In this case, as in *Peak Alarm*, we deem the detail regarding the manner and timing of the filing of a claim against the government sufficient to sustain an inference that the legislature was overriding such other laws.

[3] The point is not that "comprehensive" *necessarily* means all-encompassing, as Provo City suggests, or that it *ordinarily* means something less than that, as plaintiffs and the court of appeals insist. On this, as with many problems of statutory interpretation, dictionaries just don't answer the question. Instead they highlight the ambiguity—by including definitions encompassing both parties' positions. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 467 (1966) (defining *comprehensive* as "covering a matter under consideration completely *or* nearly completely" (emphasis added)); AMERICAN HERITAGE DICTIONARY 379 (5th ed. 2011) (defining "comprehensive" as "[s]o large in scope or content as to include much").

Yet ambiguities are often resolved by the text and structure of the statute. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 13, 248 P.3d 465. And that is the case here. The Governmental Immunity Act charts a middle course between the parties' positions: The Act is neither perfectly all-encompassing nor entirely open to supplementation; it is all-encompassing as to the terms of the

(continued…)

10

standards that dictate the timeliness of a claim asserted against the government. The Act speaks in elaborate detail on the precise timing of the initial notice of claim and of the subsequent action to be filed in district court. UTAH CODE §§ 63G-7-402 & -403. And it even includes a savings provision of its own. *See id.* § 401(8)

---

waiver of governmental immunity and the means and timing of the filing of claims seeking to embrace such waiver, but open to supplementation on other matters.

For this reason, we find it unnecessary to resolve the question presented in the briefs as to the "ordinary" sense of the term "comprehensive." Yet we appreciate the parties' briefing on that question. We note, in particular, Provo City's presentation of empirical support for its view—in search results from analysis of the use of the term "comprehensive" in naturally occurring language in the Corpus of Contemporary American English. Our court has been divided on the viability and utility of this sort of empirical analysis. *See State v. Rasabout*, 2015 UT 72, ¶ 20 (Parrish, J., opinion of the court) (opposing the use of such analysis, in part due to a lack of expert analysis or adversarial briefing); *id.* ¶¶ 36–39 (Durrant, C.J., concurring) (concluding that such analysis may be appropriate with adversarial briefing but was unnecessary in that case); *id.* ¶ 84 (Lee, A.C.J., concurring) (employing corpus linguistics as "a more transparent, reliable . . . tool" for assessing ordinary meaning where such assessment cannot be based on a dictionary or on the context of a statute). But a key point of disagreement has concerned the wisdom and propriety of our engaging in this sort of empirical analysis *sua sponte*. *See id.* ¶ 17 (Parrish, J., opinion of the court) (criticizing Justice Lee's concurrence for "deciding this case on the basis of an argument not subjected to adversarial briefing"); *id.* ¶ 39 (Durrant, C.J., concurring) (arguing that "caution dictates that this potential method of statutory interpretation be fully tested in the crucible of the adversarial process"); *id.* ¶ 97 (Lee, A.C.J., concurring) (agreeing that "[o]ur opinions are better when adversary briefing is complete and in-depth"). All agree that our analysis of this (or any other issue) will be enhanced by adversary briefing. So we commend Provo City for its briefing on this issue despite the fact that we stop short here of assessing its merits.

(allowing a thirty-day extension to file notice of claim with correct entity if initial notice was filed within the limitations period "with an incorrect governmental entity," but "in the good faith belief that the claimant was filing the notice of claim with the correct governmental entity"). We view these detailed provisions as exclusive regulations of the means and timing of filing claims against the government.[4] We accordingly hold that a claim filed outside the time limits set forth in the Governmental Immunity Act is time-barred, and cannot be resurrected by the terms of the Savings Statute.[5]

---

[4] Thus, our point is not that statute's preemptive scope is prescribed by "the mere adjective 'comprehensive.'" *Infra* ¶ 42 (Durham, J., dissenting). Instead we find an indication of the statute's exclusivity in the full breadth and detail of its terms. That is a standard way "for the legislature to negate all other statutes of general application." *Infra* ¶ 44. As the dissent concedes, the Governmental Immunity Act sets forth in great detail "the hurdles a claimant must clear before proceeding on a claim" against the government. *Infra* ¶ 43. The bond requirement is such a hurdle. We cannot ignore that hurdle while crediting the others set forth by the legislature.

The dissent concludes otherwise. It insists that the Immunity Act's "purpose is satisfied" once the timing and other requirements of the statute are met. *Id*. And it concludes that "no further purpose" is furthered by enforcement of the bond requirement. *Id*. We see the matter differently. We conclude that the legislature's "purpose" encompasses all of the terms of the statute. We see no basis for favoring one set of procedural "hurdles" over another.

[5] A contrary conclusion would allow a claimant to double the one-year filing requirement—by submitting an initial (procedurally defective) complaint at the end of the one-year filing period, waiting for it to be dismissed without prejudice, and refiling a year later. That prospect is troubling. It would place the governmental defendant in a quandary—of either forfeiting its right to insist on the procedural requirements of the Immunity Act (such as the posting of a bond) or of giving up the right to

(continued…)

12

B

¶27 The court of appeals rejected the above approach on two additional grounds. We respond to each of them here.

1

¶28 The court of appeals concluded that the "primary purpose" of the Governmental Immunity Act could be "satisfied" despite application of the Savings Statute. *Craig*, 2015 UT App 145, ¶ 12. The statutory "purpose" identified by the court of appeals was that of affording the government notice and an opportunity to "pursue a proper and timely investigation of the merits of [the] claim." *Id.* (alteration in original) (citation omitted). And because that purpose was not undermined by the revival of a claim that was filed initially in accordance with the Immunity Act's timing requirements, the court of appeals reasoned that such revival was compatible with "the statute as a whole." *Id.*

¶29 We reject this approach on grounds explained in a number of our recent decisions. As we noted in *Graves v. North Eastern Services, Inc.*, 2015 UT 28, ¶ 67, 345 P.3d 619, "the governing law is defined not by our abstract sense of legislative purpose, but by the statutory text that survived the constitutional process of bicameralism and presentment." Thus, "[w]e may resolve ambiguities in the text of the law by reference to reliable indications of legislative understanding or intent (as in legislative history)." *Id.* "But the invocation of extra-statutory *intent* as a matter overriding the statutory *text* gets things backwards." *Id.* "The statutory language is primary." *Id.* A judge's extra-textual sense of legislative purpose "is of secondary significance."[6] *Id.*

---

insist that a claim be filed within a year. We interpret the Immunity Act to avoid that quandary. By statute, Provo City was entitled to hold the plaintiffs to both the requirement of posting a bond and the requirement of filing their claims within a year of their denial.

[6] *See Schroeder Invs., L.C. v. Edwards*, 2013 UT 25, ¶ 25, 301 P.3d 994 ("We . . . must implement the particular balance of policies reflected in the terms of [the] statute. Those terms are the law. . . ."

(continued…)

¶30 We have identified some grounds for wariness of our ability to discern statutory purpose outside of the text. We have said that it is a fallacy to suppose "that statutory provisions are addressed only to the specific problems giving rise to their adoption." *Id.* ¶ 68. "[L]egislative bodies often start with one problem in mind but then reach more broadly in their ultimate enactment." *Id.* (quoting *Hooban v. Unicity Int'l, Inc.*, 2012 UT 40, ¶ 17, 285 P.3d 766). So "we cannot limit the reach of [a statute] to the ill that initially sparked [the legislature's] interest." *Id.* (alterations in original) (citation omitted).

¶31 We have also explained that "[l]egislation is rarely aimed at advancing a single objective at the expense of all others." *Myers v. Myers*, 2011 UT 65, ¶ 27, 266 P.3d 806. "[M]ost statutes represent a compromise of purposes advanced by competing interest groups, not an unmitigated attempt to stamp out a particular evil." *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 23 n.6, 248 P.3d 465. So a court cannot reliably discern legislative intent on a particular matter by reasoning generally from a statement (even an accurate one) of a broad statutory purpose. Such an approach will often distort the intent of the legislature as reflected in the law—the text—because a statement of legislative purpose often paints only a part of the picture.

¶32 And that is the heart of our disagreement with the court of appeals and with the dissent. The court of appeals and the dissent

---

(alteration in original)); *State v. Clark*, 2011 UT 23, ¶ 17, 251 P.3d 829 ("Any suppositions about what the legislature may have intended cannot properly override what it actually did."); *see also In re Sinclair*, 870 F.2d 1340, 1344 (7th Cir. 1989) ("It would demean the constitutionally prescribed method of legislating to suppose that its elaborate apparatus for deliberation on, amending, and approving a text is just a way to create some *evidence* about the law, while the *real* source of legal rules is the mental processes of legislators."); Laurence H. Tribe, "Comment," in ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 65, 66 (1997) ("[I]t is the text's meaning, and not the content of anyone's expectations or intentions, that binds us as law.").

identify *a* purpose of the Governmental Immunity Act. The goal of assuring notice and an opportunity to consider the merits of a claim may even have been a key concern sparking the legislature's attention to these issues. But we cannot reliably deem that purpose the *primary* one—much less the *only* one—the legislature sought to advance. We must acknowledge the possibility that the legislature was balancing other aims (such as the government's interest in finality and repose).[7] And the way to be sure we are considering *all* of the legislature's concerns is to stay focused on the text it enacted into law.

¶33  Our examination of the "statute as a whole," *Craig*, 2015 UT App 145, ¶ 12, must begin with the *statute as a whole*—its text, and not a general purpose it appears to advance. Thus, we must ask not whether the Savings Statute would appear to undermine a general purpose of the Governmental Immunity Act, but whether the terms of the Act leave room for supplementation. We conclude that they do not for reasons set forth above. And we reverse on the ground that the text must control over a general sense of legislative purpose.

2

¶34 The court of appeals also held the legislature to a plain statement rule. *Id*. ¶ 13.  Relying on *Standard Federal Savings &*

---

[7] The dissent identifies *a* purpose of the statute—of letting the public authorities "pursue a proper and timely investigation of the merits of [the] claim" *Infra* ¶ 43 (quoting *Craig*, 2015 UT App 145, ¶ 12). But that is not the statute's only purpose. The bond requirement serves the important function of protecting the government against the assertion of meritless claims. It does so by requiring a claimant to demonstrate its ability to pay for the costs of litigation if it proves unsuccessful. We are in no position to dismiss the significance of this purpose. Certainly we cannot conclude that "no further purpose" is evident on the face of the statute. *See Myers v. Myers*, 2011 UT 65, ¶ 27, 266 P.3d 806 (noting that legislation "is rarely aimed at advancing a single objective at the expense of all others," but is usually "a result of a legislative give-and-take that balances multiple concerns").

*Loan Association v. Kirkbride*, 821 P.2d 1136 (Utah 1991), the court held that the Savings Statute should be presumed to apply to claims under the Governmental Immunity Act. *Craig*, 2015 UT App 145, ¶ 13. And it said that this presumption would hold unless "the legislature made plain an intention" to override the terms of the Savings Statute. *Id.* (quoting *Standard Federal*, 821 P.2d at 1138). Further quoting *Standard Federal*, the court of appeals suggested that an *implicit* rejection of the Savings Statute would be insufficient. Specifically, the court said that the legislature "certainly knows how" to speak explicitly in overriding the terms of another statute. *Id.* And because the Governmental Immunity Act includes no *explicit* repudiation of the Savings Statute, the court of appeals viewed *Standard Federal* as preserving its application.

¶35  We see a plausible basis for the court of appeals' approach in applying *Standard Federal*. But we nonetheless reject this approach on a couple of grounds. First is the fact that *Standard Federal* had nothing to do with the Governmental Immunity Act. The court's analysis in that case concerned the interaction between the Savings Statute and a provision "set[ting] forth the remedies available to a creditor to recover any amounts secured by a trust deed after the property subject to the trust deed is sold." 821 P.2d at 1137 (citing UTAH CODE § 57-1-32). The statute at issue in *Standard Federal* gave a "creditor three months after a sale of property under a trust deed to bring an action for any amounts remaining unpaid." *Id.* Yet the court in *Standard Federal* emphasized that this provision did not "bar any action not initiated within three months and then resolved on the merits for the plaintiff." *Id.* at 1138. And in stating that the legislature "knows how" to prescribe such a bar, the *Standard Federal* court cited the time-bar provision of the Governmental Immunity Act that does just that. *Id.* (citing Utah Code section 63-30-13 (1989), which provided that "[a] claim against a political subdivision . . . is *barred* unless notice of claim is filed . . . within one year after the claim arises") (alteration and emphasis in *Standard Federal*).

¶36 Thus, *Standard Federal* does not at all foreclose the conclusion that the Governmental Immunity Act speaks with

sufficient clarity to override the Savings Statute. It speaks to a different issue. It says that "statutes that impose preconditions to filing suit" are generally understood "as establishing only procedural hurdles to suit, hurdles that can be cleared, rather than absolute bars to suit." *Id.* And because the Governmental Immunity Act is distinguishable from the statute at issue in *Standard Federal*, we think the court of appeals erred in reading that opinion to support its decision here.

¶37 Second, the "plain statement" principles in *Standard Federal* are problematic if taken to their logical extreme. The legislature has no duty to speak *plainly* or *explicitly*. Undoubtedly it tries its best to do so. But it sometimes falls short of the ideal, as we all do. And our role generally is not to hold another branch of government to an ideal of *plain* or *explicit* statements.[8] It is to do our best to discern the intent or meaning of the inevitably imperfect words that it enacts into law.

¶38 The words of the Governmental Immunity Act may not be perfectly clear. But if they appear to us to foreclose the applicability of the Savings Statute (as they do), then we must give effect to those words even if they are at best *implicit*. It is usually quite beside the point that the legislature "knows how" to speak more explicitly.[9] That is another way of saying that the

---

[8] We see no basis for a requirement of a plain statement by the legislature of its intent to override the Savings Statute. If anything, the operative plain statement rule in this case would cut the opposite way—against a presumption that the legislature meant to expand the waiver of immunity set forth in the Governmental Immunity Act. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984) (requiring that waivers of immunity "be unequivocally expressed").

[9] That is the general rule. But there is room for an exception. Where a party identifies not just a *hypothetical* way the legislature could have spoken more clearly, but identifies instead an *actual phrase* in a neighboring provision that articulates a clear principle, it may be possible to infer that the legislature rejected the formulation embodied in the neighboring provision. *See Standard*

(continued…)

legislature could have spoken more clearly. And typically that gets us nowhere. *See Hill v. Nakai* (*In re Estate of Hannifin*), 2013 UT 46, ¶ 25, 311 P.3d 1016.

¶39 As plaintiffs note, the Governmental Immunity Act could be more explicit. It could say that its time-bar provisions are "exclusive," or even that they override the terms of the Savings Statute. But that is unhelpful. "In any matter of statutory construction of any consequence, it will almost always be true that the legislature could have more clearly repudiated one party's preferred construction. But the converse is almost always true as well, as it is here[.]" *Id.* Thus, the legislature could also have said that the Governmental Immunity Act's time-bar provisions are subject to supplementation by generally applicable rules in Title 78B, or even by the Savings Statute specifically.

¶40 The legislature's failure to speak clearly merely frames the context of a problem of statutory interpretation for our courts. It does not yield an answer to that problem. We must do our best to find the best answer we can in the words enacted into law by the legislature, even if that answer is less than plain, and even if it appears by implication rather than an explicit statement.

¶41 Our holding here is rooted in that approach. We reverse the court of appeals, and affirm the dismissal of plaintiffs' claims as time-barred under the Governmental Immunity Act because we interpret the Act to foreclose the applicability of the Savings Statute.

––––––––––

JUSTICE DURHAM, dissenting:

¶42 I respectfully dissent. While the majority's reading of the statute is plausible, I am unpersuaded that the mere adjective "comprehensive" can legitimately be made to accomplish all the

––––––––––

*Federal*, 821 P.2d at 1138. Even there, however, the inference would hardly be automatic. There would have to be something in the terms or context of the statute to indicate that the legislature would have adopted the alternative principle in embracing the language it chose.

labor the majority attributes to it. I agree with the analysis of the court of appeals, which pointed out that "comprehensive" does not mean "exclusive," and that the Utah Governmental Immunity Act (UGIA) is in fact not exclusive on its face. *Craig v. Provo City*, 2015 UT App 145, ¶¶ 9–12, 352 P.3d 139. The court of appeals correctly noted in that regard that the statute contemplates governmental waiver of immunity, but does not even provide for or create a cause of action, requiring litigants to "turn to other statutory provisions and common law to supply the causes of action for their claims against governmental entities." *Id.* ¶ 11.

¶43   It is true that the UGIA contains a number of procedural requirements as to timing of claims. However, once again I conclude that the court of appeals correctly characterized those requirements as focusing on the hurdles a claimant must clear before proceeding on a claim and limiting the time in which civil actions must be filed. These are all requirements aimed at providing "the government with notice which 'afford[s] the responsible public authorities an opportunity to pursue a proper and timely investigation of the merits of [the] claim.'" *Id*. ¶ 12 (alterations in original) (quoting *Shafer v. State,* 2003 UT 44, ¶ 7, 79 P.3d 936). "Assuming the plaintiff complies with these requirements, the UGIA's purpose is satisfied." *Id.* Once the notice function is accomplished, no further purpose of the UGIA is implicated by the Savings Statute.

¶44 In conclusion, it seems to me that the use of the single adjective "comprehensive" (especially when the statute is clearly not comprehensive in the sense of being free-standing or exclusive) is a strange way for the legislature to negate all other statutes of general application, and a slender reed to sustain the majority's holding. I also note that the majority's inclusion of footnote 3 goes a little far in suggesting that this court has endorsed corpus linguistics as a favored interpretive tool, a question that is still under consideration. *See State v. Rasabout*, 2015 UT 72, ¶ 16, 356 P.3d 1258; *id*. ¶ 36 (Durrant, C.J., concurring); *id*. ¶ 41 (Lee, A.C.J., concurring).